May it please the Court and Counsel, Rex Blackburn for the Appellants and the Plaintiffs below, Alfredo and Veronica Delgadillo. This appeal rises from the entry by the Trial Court of summary judgment in favor of the defendants below Unitrons Consolidated Inc and Supersede Transportation Inc. The Delgadillos appealed the Trial Court's entry of summary judgment for two reasons. First, the Trial Court misapplied Section 6.1302 of the Idaho Product Liability Reform Act in considering factors that are applicable only in the context of determining liability of a distributor when the manufacturer of a defective product is subject to service. Second, the District Court identified the issue. The issue is whether or not a freight forwarder is a product seller. That's what the District Court focused on and that's the crux of this case, isn't it? Judge Tallman, indeed it is. However, in determining that Unitrons and Supertrans were not product sellers, were not distributors under the Act, the Court expressly considered factors that were inapplicable to that determination. Those factors included the factors set forth in Section 6.1302 that are to be considered by the Court only in the context of whether a product seller should be held liable when the manufacturer is present. Those factors included factors such as did the distributor, the intermediate distributor, have an opportunity to inspect the product? Did the intermediate distributor express warranties or standards of performance for the product? So you're talking about distributors and I take it by that you mean persons or firms that distribute the product. They either sell through catalogs or they maintain warehouses and package and put shipping labels on and invoicing and all of that for the product as opposed to the cost of transportation. Is there anything that was done by any defendant here that got summary judgment that had anything to do with handling in any way the product that was outside of a sealed box? Your Honor, no, they did not handle it. However, anything to do with it. Did they advertise it? Did they catalog it? Did they bill it? Did they service it? Did they inspect it? Did they warrant it? Anything. Yes, they did certain of those things and if I can address it. Let me address your first question if I might and that is did they touch the product? Did they take it out of the box? No, they did not and the case authority indicates that physical possession of the product by a distributor is irrelevant. They need not examine the product unless you're considering liability under the first subsection where the manufacturer is present. When we're talking about a distributor, generally we're talking about somebody who is managing a product. Somebody who's taking and collecting it from the manufacturer and is dealing it to individual salesmen. You may have a regional distributor in Boise who has a fleet of salesmen distributed around the state who receives it from the manufacturer and is dealing. Somebody who is a licensed dealer or distributor for this is different from somebody who distributes in the sense that we use that word who takes it and hands it someplace else. We can say, well, you've distributed it, but that doesn't make you a distributor in the way in which we ordinarily use that in commercial language. Judge Bybee, if I might, the official comments to the Uniform Model Product Liability Act, which Idaho adopted, the official comments that were drafted by the joint task force that was responsible for drafting that act identified product sellers, including distributors, in the broadest possible terms. Where do I find that in the Idaho statute? It is not in the statute, Your Honor. And where do I find it in the Idaho case law? No case has interpreted it. This is a case of first impression. But it can be found in the federal register. What does the comment say other than it's supposed to be broad? I mean, broad doesn't mean unlimited. Judge Bybee, what it says is that a product seller is any entity that is involved in the introduction into the stream of commerce of a product. That is the broad definition. If UPS delivers this, does that make UPS a distributor? They surely have distributed it in some sense of that verb. Does that make UPS now a product seller? All I can say is that with regard to UPS, that simply takes the product from point A to point B, a pure common carrier, that's an entirely different case than what we're presented with here. So you wouldn't contend that it includes China Ocean Shipping Company, whose vessel carried the machine to Houston? I would suggest that that would be better left to a different day. But the content that occurred in this particular case… You want this term to include anybody anywhere in the world who ever had anything to do with the shipment or delivery of this good, and that cannot be the law. The pure common carrier, there is case authority, not interpreting this act, but case authority in the common law that says the purest common carrier is not subject to liability, strict product liability as a distributor. As I understand what freight forwarders do, they basically lease space on the vessel, either containers or cubic footage of space, which they then arrange to fill with goods from whatever source they can find them, because they are committed to the shipper to pay for that space. Is it your contention that a freight forwarder therefore becomes a product seller of every single good that it secures in order to fill a container or that cubic footage onboard the ship? Let me respond first of all by just notifying the court. We don't concede that there isn't a triable issue of fact as to whether this entity is a freight forwarder. The record suggests that that's exactly what the freight forwarder did in this case, but if you want to answer it in a hypothetical fashion, that's fine. I want to see how far you want us to go with your broad definition of product selling. A pure freight forwarder who does certain things that perhaps these particular defendants did do, a freight forwarder who does not do the things that these defendants did, may not be subject to the act if all they are doing is stepping in the shoes of a common carrier. Okay, so what did this freight forwarder do which is different from what a typical freight forwarder does? Well, the trial court below, and I think this is the primary factor, the trial court below said that the evidence of record in this particular case would justify a, quote, reasonable trier of fact to conclude that the defendants owned the bill of lading and the goods, end quote, and I'm citing page 593 of the record. Is that correct as a matter of commercial law? The trial court in this particular case relied upon the affidavit of the defendant's expert, Mr. Johnson. Mr. Johnson said that in the instance where a negotiable bill of lading was used, and the defendants conceded that this was a negotiable bill of lading, and the, if you characterize them as a freight forwarder in this case, takes physical possession of the bill of lading, a negotiable bill of lading, then under those circumstances, the freight forwarder takes possession not, or title not only to the bill of lading but also to the underlying goods. And it was based on that testimony in the record that the trial court below concluded. But isn't that a question, I mean, isn't that a question of law in terms of simply applying the uniform commercial code? Who cares what the purported expert has to say? We can make the determination, can we not, as to whether or not under the uniform commercial code the title actually passed to the freight forwarder for purposes of this product liability statute? One might in a pure abstract setting, but there are various factual events that took place in this particular context that make that different. I think that it would require a determination of disputed issues of fact in order to determine whether title did or did not transfer. And those facts include. What more do we need besides, I mean, we can look at the documentation. You've made that part of the record. But there are also other facts. The other fact is this, that not only did Unitron and both the Speedway collect fees in China for the transportation of this particular product. But it also collected fees at the distal end of the transport. It withheld delivery of the product. But that happens when the UPS guy shows up with a COD package. He doesn't deliver the package to you until you tender the cash. Or ship FOB in China. Yeah. This was under the circumstances in this particular case. The record reflected that all of the transportation fees had previously been paid by the manufacturer in China, Ningbo. It was a CIF transaction. And the court looked at that and said the record in this particular case, because the invoice demonstrated that all of the freight charges had been paid at the point of origin of transport of these particular products, that there was a question as to whether the $900 fee that was collected by the dependents in this case at the distal end of the transaction, while they physically withheld transfer of the goods. They did not authorize the transfer of the goods to the ultimate purchaser of the product. We're talking about the original shipment of the product to the original user in the States, who in turn put it out of service and then it was shipped to the user in Idaho, right? That's correct. So there were really two shipping transactions. But the transactions that I was referring to, Your Honor, with regard to the fees, were all transactions from… But none of that occurred in Idaho. That all occurred down in Texas, right? Went to Houston. The fee was indeed collected in Houston, Your Honor. Okay. What's that got to do with Idaho law? Well, the injury occurred in Idaho. And as a consequence… For a shipment to Houston? The injury occurred in Idaho. The trial court below considered apparently venue. This has never been an issue that's been raised below. But venue was proper because the injury occurred at that particular location. The way you're slicing up the transportation from China to ultimate injury gets us involved in intermediate jurisdictions, whether you like it or not. I mean, that's on the face of the complaint. Well, all I can say is, Your Honor, it has not been an issue that has either been addressed or briefed or raised by the defendants in this particular case. I think there's sufficient evidence… I don't see that it makes much difference. If it had been shipped from China to Houston and thrown in the junk pile when they were using it down there, that would be the end of it. There would be no case. The thing that injures your client is an Idaho fire purchaser buys used equipment from somebody that has surplus equipment in Texas and ships U.S. with a COD on the freight, right? Yes, Your Honor. And if you say that's enough to invoke the statute, that's what you've got to rely on. I don't think you can rely on anything that happened in China. If we're raising a question of personal jurisdiction, which I believe the court is touching upon, can the conduct of the defendants in this case in Texas give rise to personal jurisdiction in the state of Idaho if one assumes that the introduction into the stream of commerce of a product occurred only in Houston? Personal jurisdiction has been waived. If we're talking about the Volkswagen case and those types of cases, the defendant made a voluntary appearance in Idaho and did not dispute personal jurisdiction in the state of Idaho. But you're referring to shipping, and the shipping was from Houston to Idaho, not from China to Houston. The shipping from Houston to the state of Idaho has never been an issue in the case. In terms of the application of the Idaho Act, the only shipping that has been an issue has been the shipping from China into the United States. But who started this was your claim that when the product arrived in Idaho, the Idaho purchaser was making a payment for transportation. It had nothing to do with the manufacturer in China, right? And that was sufficient. Your Honor, I apologize. I'm missing your point. You start in China where you manufacture the product. You can't get jurisdiction over any of those people. You probably don't have jurisdiction over the carrier from China to Houston. So you get the product to Houston, and you have a user, and it has nothing to do with Idaho. Then the product wears out in Houston or becomes obsolete in Houston, and it goes on the junk market. Somebody packages it up, delivers it to a shipper in Houston, and that is the introduction of the product to Idaho. There's no salesman. There's no intermediary. I don't know how the purchaser's purchase was arranged. But in any event, the shipper charges fees for shipping a sealed box from Houston to Idaho, and you're saying this triggers the act. He's responsible for the loss of an arm. I am not suggesting that, Your Honor. The sole issue in this case is who introduced it. Were they a distributor in the introduction of this product into the United States stream of commerce? That's the only question. There's no evidence of record with regard to the manner in which this particular machine got from Houston to Boise, Idaho. All of the issues in this case relate to the introduction into the United States stream of commerce of this particular machine from China. Mr. Blackburn, this is a related issue. As I understand the state of the maritime licensing laws, a freight forwarder only requires a customs brokerage license if they're shipping goods out of the United States, but that the law was subsequently changed after this particular shipment occurred. Is that correct? That is correct, Judge Thomas. So then I can disregard the claim that a freight forwarding license was required at the time of this particular shipment. That's not actually an accurate statement of what U.S. law was at that time. A freight forwarder was required to have a license. But not to ship goods into the United States. They were not a freight forwarder if they were shipping goods into the United States. Okay. So no license was required at that point. I would simply indicate that this is a belated argument that has been made. Is the answer to my question yes? The answer to your question is that no license was required for this particular transaction. That is correct. But then the question becomes what were they if they were not a freight forwarder? I think we understand that. Do you want to save some time for rebuttal? I would. Okay. Why don't you stand down for a moment and we'll hear from you as well. Good morning, Your Honors. It's a pleasure to be here. There might be some misunderstanding as to what was going on, I think, and I'd like to spend a second to get that straight. Superspeed and Unitrons, Superspeed Transportation Inc. and Unitrons, Consolidated Inc. provided freight forwarding services. Freight forwarding services are kind of a generic term. More technically accurately, they're a non-vessel operating common carrier. And the question here is, based on the evidence, could a reasonable jury conclude that Superspeed Transportation Inc. and Unitrons, Consolidated Inc. were product sellers of plastic extruder machines, including the machine in question? That's the issue. And there really isn't any issue as to applying the law of the state imputed liability properly. When I made the motion for summary judgment, I made the motion as it relates to a number of different claims for relief, including negligence-based claims, breach-of-contract-based claims as well. And that's the basis for my setting forth the various facts that relate to those types of claims. The primary focus, of course, has been were they or were they not product sellers. The reality is there's nothing in this record that sets Superspeed and Unitrons apart from ordinary providers of transportation services at all. The bill of lading is quite plain. It is used everywhere, negotiable bills of lading. And I'm sorry if there was a misreading of the expert's testimony, but the reality is I have the original bill of lading in my office. If my secretary goes and gets it, she is not an owner of a plastic extruder machine, and I am most assuredly not the owner of a plastic extruder machine. The reality is it's made to, in this situation, it was made out to Metro Bank. Metro Bank, because Metro Bank issued the letter of credit, Metro Bank then endorsed it to AgroMeshBag, and then they delivered it to Unitrons as proof that the thing had been paid for, and then they allowed its release. The $900 needs to be explained just a little bit as well. The $900 actually is 880, well, 917. The $917, 882 of that relates to destination carrier charges. Destination carrier charges are charges. Destination charges are not an unusual thing in shipping, and destination charges are the sorts of things that are paid by the ultimate buyer. When I buy a car, the person who sells me the car wants to charge me destination charges. There's different sorts of destination charges, of course, but the reality is those are outside of the terms of shipping, outside of the CIF terms. That basically covers cartage on the docks, right, or from an intermediate warehouse into the packing container before the container is loaded with other goods. That's what destination carrier charges are. In this situation, it's not exactly clear. It's precisely what they were referring to. This machine took up an entire ocean shipping container. So they didn't have to unpack it and take something else out in order to get to it. Exactly. It was not consolidated freight. In this situation, it took up an entire shipping container. It's a big machine. It's 35,000 pounds on the order of 10 Buick sedans. It was shipped from China to Houston, always sealed. Then there's costs, of course, from taking it off the ship, putting it on the dock. I've been to the port at Houston. There's little vehicles that drive it over. People go right down here to the docks and see the same thing going on. That's what destination carrier charges are. It's compensation for the handling of the good once it leaves the vessel. Sometimes as it's leaving the vessel, sometimes it's while it's moving it to the container yard, sometimes moving around in the container yard until you get it picked up. Until somebody actually comes with a tractor, I guess, to hook up to the trailer on which the container has been placed. Then that guy gets paid to carry it to Idaho from Houston. That's correct. That's a different charge. That's not a destination carrier charge. The way that it actually played out in this particular case is AgriMesh Bag, the ultimate buyer, happened to be in Texas. It didn't have to be shipped anywhere. AgriMesh Bag set it up, used it for quite a while, operated it. AgriMesh Bag moved it to Idaho. Actually, AgriMesh Bag then sold its facilities in Idaho to KD Industries. KD Industries is who employed Mr. Delgadillo. So what you have here is you have, in this situation, AgriMesh Bag, who's an entity who really owned it, who really imported it, who really used it, who really sold it, but they're not liable under the theories of strict product liability because they're an end user and an occasional seller. Quite honestly, this would be a dramatic extension of products liability law in any jurisdiction if you were to have someone tangentially associated or peripherally associated with the transportation. There really isn't any documents in this case. There really isn't any testimony, and there really isn't any reason to suggest that Superspeed Transportation, Inc. and Unitrons Consolidated, Inc. were product sellers of plastic extruder machines. As a matter of fact, there isn't any evidence that they provided even so much as transportation services for another plastic extruder machine. So the truth is, not only isn't there a reasonable basis for a jury to conclude that they were product sellers of plastic extruder machines, there really isn't even a scintilla of evidence that they were. I'd be glad to go through any testimony or any documents to speak of it, but it sounds to me like the court has a pretty good view, quite honestly. Well, we've read the briefs and we've looked at the record, and unless there's something you want to emphasize, I think we understand that portion of the case, at least what the relevant facts are. Let me say something, if I can, about the imputed liability argument. The imputed liability argument, if I might be so bold, I would think of it as the mother of all red herrings, because if my clients are in fact product sellers of plastic extruder machines, then they're potentially liable, regardless of whether it's imputed liability or not imputed liability. And if there's a genuine issue as to whether or not my clients are product sellers of plastic extruder machines, then it should be reversed. But the reality is they're not, they haven't been, and imputed liability doesn't matter. It's only an issue as to product sellers. Product seller is a prerequisite to imputed liability. So with that, I don't want to waste the court's time. If the court has no questions, I think my arguments and information is adequately presented in the briefs. Very well, Mr. Bond, we'll let Mr. Blackburn have the final word. Thank you. I'd like to speak to the representation to the court that application of the imputed liability section of the Model Act, the Idaho Act as adopted, would constitute a dramatic extension of product liability law in this case. The Model Act, and with all respect to Judge Beeser, our state does not publish comments to any model or uniform act. It's a matter of policy. That's not to suggest that the influential comments are not. Well, when I deal with a federal statute, I get all kinds of statements by a congressman on the floor of the House or Senate saying this bill means this, that, and the other thing. And to me, it doesn't mean much because that's just the view of one congressman or committee or somebody else. If it's in the act, I've got to pay attention to it. And I just merely made the observation that these Model Acts or Uniform Acts or ABA-sponsored acts or whoever promotes legislation, their views of it are not necessarily controlling when you're talking about a court. I appreciate that. That's my only point. I would indicate, however, that in our state, when we're dealing with acts that are promulgated by the National Conference of Commissioners on Uniform State Laws, like the Uniform Commercial Code, our state often turns to the official comments to an act as an interpretive guide for the meaning of the words that are in the statute. In a case such as this, where the term distributor is undefined in the statute, consideration of what the drafters of the statute felt. What have you got in the comments, Counselor? The comments indicate two things, Your Honor. And I'm paraphrasing, but it's a very close paraphrase. The first is that a product seller, including a distributor, within the meaning of the act, does not require a traditional sale. It is the introduction into the stream of commerce. Those are the operative words. And we have cases that predate the adoption of this act, California, the state of Washington, Illinois, that have used identical phraseology. The policy tradeoff, and the comments speak to this, and it's set forth in the express provisions of the act, but the policy tradeoff that the act reflects is this. In those countries who avoid service of process upon their manufacturers, such as communist China in this particular case, where they've made a policy decision that they are not going to permit their manufacturers to be held accountable in American court of law, the comments say that the purpose of imputing liability to distributors, those that introduce the product into the stream of commerce, is to give one injured by the use of a product a remedy against any viable defendant. And that is a quote from the comments. Except that it does recognize the common carrier exception. And so the question really for us to decide is, is the freight forwarder who arranges the services of the common carrier, employs the common carrier, if you will, for the purpose of transporting the good, is actually a seller within the meaning of the statute. I think that that's a fair interpretation. However, appreciating I'm out of time, I would ask the court to recognize that there are a number of activities, at least there are disputed issues of fact in the record as to, that demonstrate conduct that takes this case well beyond the UPS or the FedEx type case. The bill of lading issue, the fact that they insured themselves for delivery of products that may cause injury to a person, the fact that they withheld the product from the ultimate purchaser, that they collected a significant fee, the actual application of which is in dispute in the record. What did they collect? They collected over $900 on a machine, the purchase price of which was in the $40,000 range. That's correct. Okay. So the question then I guess for us in looking at the policy of the law is, is it fair to tag a party that collected $900, and of which I think a significant portion of that went to others, for the responsibility for a product that was sold for many times that amount? I would ask the court. I mean, where in the amount that they collected is the risk inherent in being liable under the statute for that kind of risk? Even a distributor, Your Honor, that makes a poor deal, that sells a product at a loss, is subject to liability under the Act. There's no profitability requirement. Well, but there is, and I think the legislature recognized that. There is certainly a notion within the statute that it is not unfair to hold people who profit from the sale of the machine liable, even if they are, let's say, a U.S. distributor, a middleman in the transaction. But the question is whether the freight forwarder is more like a middleman or more like a common carrier. I think we understand your argument, Your Honor. I know I'm beyond my time. We'll give it our best effort and get to the answer. I appreciate the court's consideration. Thank you for your argument, counsel. The case just argued is submitted, and we will turn to United States v. Castillo and Dominguez. The case of the United States v. Garcia has been ordered and submitted on the brief.
judges: Beezer,tallman, Bybee